# EXHIBIT B

## TRADEMARK LICENSE AGREEMENT

### PREAMBLE

**AGREEMENT** made as of the 1st day of April, 2004, by and between Sa-al Universal LLC ("Licensor"), a New York limited liability company having an office at 247 West 37th Street, New York, New York 10018 and JMB Apparel Designer Group, Inc. ("Licensee"), a New York corporation, with an office at 214 West 39th Street, New York, New York 10018.

### W I T N E S S E T H :

**WHEREAS**, Licensor is the owner in the United States and Canada of registrations for the trademark "Sharagano" (the "Trademark") in connection with wearing apparel;

**WHEREAS**, Licensor has extensively promoted the Trademark and Licensor has widely distributed apparel under the Trademark in the U.S.; and

**WHEREAS**, as a result of the promotion and sale of goods bearing the Trademark, the Trademark have acquired a substantial reputation and goodwill;

**WHEREAS**, Licensee is desirous of associating certain of its products with the Trademark; and

**WHEREAS**, Licensor is willing to grant a license to Licensee to use the Trademark in conjunction with the Licensed Products (as such term is defined below) in the Territory hereinafter defined, subject to the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the promises set forth below, it is agreed as follows:

### ARTICLE I

1.      Scope

DM:00309114.1

1.1     The term of this Agreement shall commence on the date set forth above and expire automatically on September 30, 2007, unless sooner terminated pursuant to the terms and conditions hereof (the "Initial Term"). For purposes of this Agreement, "Contract Year 1" is the period beginning on this date and ending on September 30, 2005, and with each successive "Contract Year" being each successive twelve month period ending thereafter on October 31st.

1.2     The territory of the license granted hereunder is hereby defined as and limited to the United States, its territories, and possessions, Puerto Rico and Canada (the "Territory"). Licensee shall not sell Licensed Products outside the Territory or to any person or entity Licensee knows, or should know, will sell products outside the Territory.

1.3     The goods to which this license relates are hereby defined as and limited solely to ladies' suits in all sizes at the suggested retail sales prices set forth in **Exhibit A**, sold only as suits and not as separates (the "Licensed Products") and no other goods. Licensor shall, in its sole discretion, be entitled to determine whether a particular kind, item or style of product comes within the scope of Licensed Products. Licensor's aforesaid determination shall be final.

1.4     Licensor hereby grants to Licensee a non-transferable, non-assignable and non-sublicensable (i) exclusive license to use the Trademark during the Initial Term in the Territory and solely on and in association with the promotion, advertising and selling of the Licensed Products and (ii) non-exclusive license to manufacture the Licensed Products anywhere in the world for sale only in the Territory. Licensee shall sell Licensed Products only to department stores and better specialty stores to which Licensor sells its ladies apparel merchandise (such present customers are listed on the Schedule annexed hereto as **Exhibit B**) and such other stores approved, in advance, in writing, by Licensor, in its sole discretion. Notwithstanding anything contained above, if the pricepoints, presentation or mix of products of a store to which Licensee sells Licensed Products change so as, in Licensor's reasonable judgment, to make the continued sale of Licensed Products to such store injurious to the Sharagano brand, Licensor may, in

any such event, notify Licensee that no further sales of Licensed Products may be made to any such store (an "Excluded Retailer"), in which event Licensee shall make no further sales of Licensed Products to such Excluded Retailer except to fill prior binding orders existing as of the date Licensor notifies Licensee that a retailer has been excluded therefrom. Notwithstanding anything contained to the contrary in this Agreement, Licensee is not granted any right to sell Licensed Products through the Internet or to any person or entity that Licensee knows or has good reason to know will sell Licensed Products directly or indirectly through the Internet, except for "brick and mortar" retailers maintaining an internet site. Licensee shall not sell or distribute Licensed Products to retail purchasers for their use as premiums, prizes or giveaways. Licensee shall use best efforts to promote and sell Licensed Products. All rights in the Trademark not expressly granted in this Agreement to Licensee are reserved by Licensor.

1.5      Licensee shall at all times maintain a showroom in New York for purposes of selling the Licensed Product. Licensee shall use its best efforts to obtain sales of Licensed Products. Licensee shall ship on time at least eighty-five (85%) percent of accepted orders for Licensed Products. Licensee shall at all times retain a full time designer for the design of Licensed Products, which designer presently is Olivia Song and two (2) salespersons, one to represent Licensee as to department stores and the second to represent Licensee as to specialty stores (the "Salespersons"). In the event Licensee shall not have retained both Salespersons within forty-five days from the date hereof, Licensor, at its option, shall be entitled to terminate this Agreement on written notice to Licensee in which event Licensor shall refund to Licensee the signing payments paid pursuant to paragraphs 2.2 and 4.1 below, and the parties shall have no further obligations one to the other. The initial line of Licensed Products shall be offered for sale no later than July 30, 2004. Licensee shall not during the Initial Term, or for one (1) year thereafter, employ or retain the services of any individual who then performs design or sales services for Licensor, or who in the year before any such employment or retention by Licensee had performed design or sales services for Licensor.

1.6         Licensor represents and warrants to Licensee that it is the owner of registrations of the Trademark in trademark class 25 in the United States and Canada.  Licensor makes no representations or warranties to Licensee concerning the Trademark except as expressly set forth in this paragraph.

1.7         Licensee shall use its reasonable commercial efforts to sell all Licensed Products at its wholesale list price therefor, in compliance with the next sentence, which list prices shall, after adopted by Licensee, be furnished to Licensor in writing, and not be changed except on written notice to Licensor, and, in any event, in compliance with the next sentence.  Licensee shall, at all times, offer, with suggested retail prices, not less than as specified in **Exhibit A**, which pries shall be on tags on the garments.  Licensee shall furnish Licensor with its wholesale list prices confirming its compliance with the above provision at least twenty (20) days before the start of each selling season.  Licensee's continued compliance with the aforesaid provisions are essential to the maintenance of the prestige associated with the Trademark. Notwithstanding anything contained above Licensee may sell end of season closeouts to retailers to whom Licensor is then selling its closeout apparel products, provided, however, that such close-outs do not account for more than twenty-five (25%) percent of the units of Licensed Products sold by Licensee in any Contract Year (a close-out being defined for all purposes under this Agreement as a sale at more than twenty-five (25%) percent off the then wholesale list price).  Close-outs may only be sold to the retailers specified on **Exhibit** C hereto ("Authorized Close-Out Customers").  Licensor shall be entitled to remove a retailer (or one or more of its stores) from Authorized Close-Out Customers if sales to such retailer (or stores) would damage sales of Licensed Products or other products bearing the Trademark to customers that are not Authorized Closeout Customers.

(a)         Licensor represents and warrants to Licensee that (a) it is a limited liability company organized and existing under the laws of the State of New York; and (b) the execution, delivery and performance of this Agreement (i) have been authorized by all necessary corporate action of Licensor

DM:00309114.1

and (ii) do not conflict with any agreement or instrument to which Licensor is a party or is otherwise bound.

(b)          Licensee represents and warrants to Licensor that (a) it is a corporation organized and existing under the laws of New York; and (b) the execution, delivery and performance of this Agreement (i) have been authorized by all necessary corporate action of Licensee and (ii) do not conflict with any agreement or instrument to which Licensee is a party or is otherwise bound.

1.8          Licensee shall not directly or indirectly, or through any corporate affiliate or principal thereof, during the Initial Term (i) enter into a license agreement, or other agreement, with any person or entity, granting them the right to sell products within the product categories comprising Licensed Products under a brand/trademark Competitive (as such term is defined below) with that of the Trademark or (ii) otherwise sell, or render services in connection with products within the product categories comprising Licensed Products which bear a brand/trademark which is Competitive with the Trademark to a wholesaler, distributor or retailer.  Brands/trademarks which are Competitive with the Trademark mean for this paragraph 1.9 Theory, BCBG, Laundry, Max Studio, ABS, and Vertigo, and no other companies.  A corporate affiliate means any entity which controls, is controlled by, or is under common control with, Licensee.

1.9          The contents and workmanship of the Licensed Products shall be at all times of high quality, consistent with the reputation, image and prestige of the Trademark.  The Licensed Products shall comply with all applicable laws and regulations.  As a condition to the license granted under this License Agreement, Licensee hereby agrees and represents to Licensor that in connection with the manufacture, production, and sale of Licensed Products and components thereof, Licensee will not use any manufacturer which does not at all times comply with laws applicable to the country of manufacture, including without limitation, labor laws, wage and hour laws, child labor laws, environmental laws and laws relating to a safe workplace. Licensee shall immediately cease using any manufacturer that does not comply with such laws.

1.10          Licensee shall sell to Licensor or any designated affiliate, or cause its contractors to sell to Licensor or its designated affiliates, franchisees or licensees Licensed Products ordered by Licensor or such affiliate, franchisee or licensee for sales only to consumers, and not stores, through (A) an Internet site operated by Licensor or one or more affiliates or licensees thereof or (b) retail stores operated by Licensor, affiliates thereof, or licensees or franchisees of Licensor or its affiliates, at a price equal to thirty (30%) percent below Licensee's then wholesale list price therefor, upon sixty (60) days payment terms. Sales made under this paragraph 1.11 shall not be deemed Net Sales for purposes of this Agreement and no Percentage Royalty (as such term is defined in Article II below) or Advertising payments pursuant to Article IV shall be due Licensor based on such sales.

1.11          Licensor shall provide to Licensee on a quarterly basis its then existing customer list for Licensee's use solely in connection with this Agreement, such list being confidential, proprietary information of Licensor. Licensor shall make available Licensor's designers to Licensee, from the location in which such designers work, to enable Licensee to review upcoming styles of Licensor in order so that Licensee may coordinate Licensee's lines of Licensed Products with Licensor's product line. Licensor shall provide Licensee at Licensor's expense (a) on a semi-annual basis with Licensor's press kit then used by Licensor and (b) with copies of advertisements placed by Licensor, promptly after placement or publication thereof. At Licensee's option, Licensor shall provide Licensee with Licensor's resources for piece goods used in Licensor's line solely for Licensee's use in developing Licensee's line of Licensed Products.

<u>ARTICLE II</u>

2.          <u>Royalties and Records</u>

DM:00309114.1

2.1      In consideration for the license granted hereunder, Licensee shall pay Licensor a royalty equal to seven (7%) percent (the "Percentage Royalty") of Licensee's Net Sales (as defined below) of Licensed Products. Such Percentage Royalties shall be paid to Licensor by the twentieth day after the end of each Quarter for the Net Sales of Licensed Products obtained during the prior quarter. A "Quarter" shall be each period ending June 30, September 30, December 30 and March 30. Along with each payment of Percentage Royalties, Licensee shall transmit to Licensor a written sales report signed and certified as accurate by the President of Licensee covering the immediately preceding Quarter. Said report shall set forth the total gross sales and the computation of Net Sales by retail customer (identified by name and address) for all Licensed Products which were sold during the preceding Quarter. (All invoices showing sales of Licensed Products by Licensee, on a customer-by-customer basis, shall also be available for Licensor's inspection upon at least five (5) business days notice to Licensee.) Such reports are required even if no sales have been made. In no event shall Licensor's acceptance of Licensee's reports, or of payments made pursuant thereto, be deemed a waiver of Licensor's right to challenge the accuracy of any report or the amount of any payment due from Licensee. Licensed Products are deemed "sold" on the earlier of the date when shipped or invoiced by Licensee to a retail customer. Licensee's "Net Sales" means an amount equal to the invoice price billed by Licensee, less only amounts payable for sales taxes billed to and paid by the customer, if any, and for reimbursement of freight charges actually incurred by Licensee billed as separate items to the customer, credits allowed on returns of defective merchandise and customary trade allowances actually granted by Licensee (but no other deductions) (collectively the "Credits"). "Credits" shall not exceed ten (10%) percent of Licensee's Net Sales of Licensed Products in any Contract Year.

2.2      Licensee shall pay Licensor as irrevocable, non-refundable minimum guaranteed royalties during the Initial Term, regardless of the amount of Licensee's Net Sales of Licensed Products, the total sum of Nine Hundred Ten Thousand ($910,000.00) Dollars ("Minimum Guaranteed Royalties") payable, as follows:

DM:00309114.1

| On Signing | $ 52,500.00 |
| October 1, 2004 | $ 34,375.00 |
| January 1, 2005 | $ 34,375.00 |
| April 1, 2005 | $ 34,375.00 |
| July 1, 2005 | $ 34,375.00 |
| | |
| October 1, 2005 | $ 70,000.00 |
| January 1, 2006 | $ 70,000.00 |
| April 1, 2006 | $ 70,000.00 |
| July 1, 2006 | $ 70,000.00 |
| | |
| October 1, 2006 | $105,000.00 |
| January 1, 2007 | $105,000.00 |
| April 1, 2007 | $105,000.00 |
| July 1, 2007 | $105,000.00 |

2.3          Licensee shall keep complete and accurate separate records of all manufacturing and sales of Licensed Products, including, without limitation, all invoices and purchase orders to and from customers and to and from manufacturers, and other records specifying the types of Licensed Products manufactured and/or sold to Licensee and retail customers, the quantities sold, the dates of shipment, the dates of invoices, the customers to whom sold, the invoice prices and terms, returns, discounts and all other records relating to the manufacture and sale of Licensed Products, and the computation of Net Sales. Licensee shall use in such records different style numbers for Licensed Products from those Licensee uses in connection with items or lines sold without use of the Trademark. Licensee shall prepare and maintain records for the Licensed Products separate and distinct from those prepared and maintained for items or lines sold without use of the Trademark. The aforesaid records, including all underlying documents and other documents required by Licensor to perform a full audit of Licensee's manufacture and sales of Licensed Products shall be open to inspection and duplication by Licensor, and/or its designated representative(s), at all reasonable times, upon not less than five (5) business days prior notice, during business hours and shall be maintained and preserved by Licensee for two (2) years after the expiration of this Agreement. Such audits shall not take place more than once per Contract Year except for good cause shown. If as a result

of any audit of Licensee's books and records hereunder, it is shown that Licensee's Net Sales of Licensed Products were understated by three (3%) percent or more, Licensee shall reimburse Licensor for the reasonable cost of such audit, and Licensee shall, in any event, make all payments required to be made to eliminate any discrepancy revealed by said audit plus interest payable pursuant to paragraph 2.5 below within ten (10) days after Licensor's demand therefor.  If the aforesaid audit is not disputed within forty-five (45) days after receipt by Licensee, it shall be deemed binding on Licensee.

2.4        Licensee shall be entitled to take as a credit (a) Percentage Royalties paid by Licensee to Licensor in a Contract Year against the Minimum Guaranteed Royalties payable only in the same Contract Year and (b) Minimum Guaranteed Royalties paid to Licensor in a Contract Year against the Percentage Royalties payable to Licensor only in the same Contract Year, all to the extent not previously credited.  After all crediting is applied in any Contract Year, Licensee shall be required to have paid Licensor for each Contract Year the greater of the sums payable for such Contact Year: (a) as Percentage Royalties or (b) as Minimum Guaranteed Royalties, but no more than such amount.

2.5        Any payment of royalties not made to Licensor by ten (10) days after due date therefor shall bear interest at the rate of twelve (12%) percent per annum.

2.6        Licensee shall obtain during each Contract Year of the Initial Term of at least the following amount of Net Sales during each Contract Year (which shall be referred to as "Annual Minimum Net Sales" for the Contract Year in question):

| Contract Year 1 | $3,000,000.00 |
| Contract Year 2 | $4,000,000.00 |
| Contract Year 3 | $6,000,000.00 |

### ARTICLE III

3.        **Licensor's Control of the Licensed Products and Trademark**

3.1         Licensee shall offer at least five (5) representative collections of Licensed Products in each Contract Year, with shipments of Licensed Products occurring monthly. There shall be in each such collection at least fifty (50%) percent new styles of Licensed Products, never used before by Licensee.

3.2         The contents and workmanship of the Licensed Products shall be at all times of high quality, consistent with the reputation, image and prestige of the Trademark.   The parties acknowledge that the fit of the Licensed Products shall be appropriate for contemporary suits sold to suit departments but with a more generous fit than the customary Sharagano fit. The Licensed Products shall comply with all applicable laws and regulations.   Licensor shall be entitled to exercise control with respect to the design and quality of Licensed Products to the extent provided below.   For each item of Licensed Products bearing the Trademark to be manufactured for and/or sold by Licensee, the following procedures shall apply:

(a)         At least forty-five (45) days prior to the earlier of (i) the showing of the Licensed Products to prospective purchasers or (ii) the manufacture of the item of Licensed Products in question, Licensee shall deliver to Licensor, at Licensee's sole cost (A) a drawing or CAD for each proposed item of Licensed Products and (B) a representative pre-production sample, which drawing/CAD and sample shall be subject to Licensor's prior written approval both as to design and quality which approval may be granted or withheld in Licensor's sole discretion.   Approvals or rejections shall be made in writing within fifteen (15) days after Licensor's receipt of the drawings/CADS or samples.   In the event Licensor does not deny approval within fifteen (15) days after receipt of a sample or drawing/CAD, such item shall be deemed approved.

(b)         In the event Licensee proposes at any time to change the method of manufacture, materials, nature, quality or style of an item of Licensed Products, such changed Licensed Products shall be considered new items and shall be submitted for approval as specified above;

(c)        Licensee shall not use the Trademark on any product or item that has not been approved by, or which has been disapproved by Licensor;

(d)        Licensor shall have the right to inspect during normal business hours the premises and warehouse(s) of Licensee, and its contractors, to determine compliance with the provisions of this paragraph 3.2, upon reasonable intervals, and/or upon a good faith showing that non-compliance may be occurring, upon three (3) business day's notice;

(e)        Without limiting Licensor's rights under Article VI below, in the event Licensee manufactures any Licensed Products which are not approved by Licensor, or which do not comply with paragraph 3.2(f) below, Licensee, at Licensor's request, shall immediately cease and desist any further production and sale of such Licensed Products unless and until otherwise instructed by Licensor; and

(f)        Production items of Licensed Products shall be at least of equal quality to the samples approved hereunder and shall be of the same design approved by Licensor.

3.3        Licensee shall never (a) seek to register anywhere in the world (i) Trademark or (ii) or any mark using the word "Sharagano" or otherwise confusingly similar to the Trademark (each a "Related Mark"), (b) dispute Licensor's ownership of the Trademark or a Related Mark, or (c) oppose Licensor's registration of the Trademark or a Related Mark in any jurisdiction.

3.4        The use of the Trademark by Licensee shall inure to the exclusive benefit of Licensor, and Licensor shall have the exclusive right to obtain registrations of the Trademark for the Licensed Products in the United States and elsewhere throughout the world. Licensee acknowledges that the Trademark enjoys secondary meaning with the consuming public. The copyright for all non-basic designs embodied in each style of Licensed Products, and for all advertising or promotional materials or other materials specified in paragraph 3.5 below, made by or for Licensee, which are associated with the Trademark shall vest exclusively in Licensor. Licensee shall not use, or grant any third party the right to use, in whole or in any

DM:00309114.1

material part, any non-basic designs embodied in the Licensed Products for any products other than Licensed Products. Licensee shall, upon the request of Licensor execute all such documents, including registered user agreements, as Licensor may deem necessary to secure and maintain title to and registrations of the Trademark and the aforesaid copyrights in the name of Licensor. This Agreement does not constitute Licensee the legal representative or agent of Licensor for any purpose, and Licensee shall make no representation to that effect. Neither Licensee nor Licensor is granted any right or authority to assume or create any obligation or representation, express or implied, on behalf of or in the name of the other party, or to bind the other party in any manner whatsoever.

3.5       All packaging, labels, tags, signs, documents, stationery and other objects bearing the Trademark, and all advertising and sales promotion materials and press releases relating to Licensed Products bearing the Trademark or this license, made by or for Licensee shall be submitted to Licensor for its prior approval. Licensee shall submit fair and representative samples of such materials and items to Licensor and seek approval of same, which approval may be granted or denied in Licensor's sole discretion.

3.6       Licensee shall use and display the Trademark with ® where the trademark is registered, and ™ in where an application is pending for the registration of the Trademark, in such form and manner in compliance with law as is specifically approved in writing by Licensor. Licensee shall not join any other names or trademarks with the Trademark.

3.7       If Licensee requests in writing design services from Licensor, Licensee shall pay Licensor a design fee therefor, on a case by case basis, as agreed upon in advance in writing signed by both Licensor and Licensee.

<u>ARTICLE IV</u>

4.       <u>Advertising</u>

4.1        Licensee shall pay Licensor during the Initial Term for Licensor's advertising and promotion of the Trademark in a manner of Licensor's choosing, a sum equal to the greater of (a) two (2%) percent of Licensee's Net Sales of Licensed Products or (b) the sum of (i) Seventy-Five Thousand ($75,000.00) Dollars in the First Contract Year, (ii) Eighty Thousand ($80,000.00) Dollars in the Second Contract Year and (iii) One Hundred Twenty Thousand ($120,000.00) in the Third Contract Year.  (Each such sum is a "Required Annual Advertising Payment".)   Such Required Annual Advertising Payments shall be paid by Licensee to Licensor by four (4) quarterly payments, no later than the twentieth day after the end of each Quarter by payments equal to the greater of (a) two (2%) percent of Licensee's Net Sales of Licensed Products during the preceding Quarter or (b) (i) Eighteen Thousand Seven Hundred Fifty ($18,750.00) Dollars in Contract Year 1 (with the first Eighteen Thousand Seven Hundred Fifty ($18,750.00) Dollars due on signing and the other quarterly payments due on October 30, 2004, January 30, 2005 and April 30, 2005), (ii) Twenty Thousand ($20,000.00) Dollars in Contract Year 2 and (iii) Thirty Thousand ($30,000.00) Dollars in Contract Year 3.   Subject to paragraph 4.2 below, all monies received by Licensor from Licensee pursuant to this paragraph 4.1 shall be spent on advertising which includes images of the Licensed Products.

4.2        If Licensee wishes to engage in any advertising or promotional activities, Licensee shall submit to Licensor for Licensor's prior written approval (to be granted or denied in Licensor's sole discretion) all advertising and promotional materials and complete descriptions of placement thereof. Licensee shall promptly furnish to Licensor, at no expense to Licensor, copies of all print advertisements, videos, and editorial press coverage obtained through Licensee's public relations and advertising activities.   Notwithstanding anything contained to the contrary in paragraph 4.1, if Licensor, in its sole discretion, approves in writing, in advance, advertising proposed by Licensee (provided such advertising is in the form of print advertising) in accordance with the first sentence of this paragraph 4.2, the actual out-of-pocket costs Licensee pays to third parties, as confirmed by accurate documentary payment evidence provided by Licensee to Licensor for such advertising, subject to the next sentence, shall be credited on a dollar-for-

dollar basis against Licensee's obligations to make payments to Licensor pursuant to paragraph 4.1 above. Licensee, for any such approved advertising, must use photographs from photographic shoots paid for by Licensor or provided by retailers for co-op advertising which are approved by Licensor. If the photographs were used by Licensor for advertising paid for with monies paid by Licensee pursuant to paragraph 4.1, Licensee may use those photographs one or more times for advertisements or promotional purposes approved by Licensor (in the same season only) without charge. If the photographs were taken at a shoot arranged by Licensor because Licensee wished to use new photographs for an approved advertisement it would place, Licensee shall reimburse Licensor for the pro rata cost of the time expended for the shoot devoted to photographs relating to the Licensed Products.

4.3        The use of any celebrity or other person as a spokesperson for Licensee in connection with Advertising or promotion of the Licensed Products must be approved in advance in writing by Licensor, which approval may be granted or denied in Licensor's sole discretion.

4.4        Licensee shall, at its sole expense, maintain its own both for selling Licensed Products at each Coterie and Intermezzo trade show in which Licensor participates. Licensee shall be entitled to use Licensor's regional showrooms provided Licensor and Licensee agree, in writing, in advance, of the cost and payment terms therefor.

## ARTICLE V

5.        Indemnification and Insurance

DM:00309114.1