# EXHIBIT B (Con't)

5.1     Licensor shall defend Licensee by counsel reasonably acceptable to Licensee (it is agreed that Davidoff & Malito LLP is so reasonably acceptable) and indemnify and hold Licensee harmless from and against any and all actions, claims and proceedings asserted against Licensee by a third party (a) in which it is asserted that Licensee's use of the Trademark in the Territory strictly in accordance with this Agreement, violates the trademark rights of an unrelated third party or (b) where such third party claim arises from Licensor's breach of this Agreement.  For any matter indemnifiable hereunder, Licensor shall indemnify Licensee against all out-of-pocket losses including the payment of any and all claims, damages, expenses (including reasonable attorneys' fees and disbursements), costs, liabilities, settlements, fines or judgments actually suffered by Licensee (but not for lost profits, consequential damages or punitive damages unless paid by Licensee to a third party as a result of a claim indemnifiable hereunder).  This indemnity shall be paid within thirty days after the submission of a statement to Licensor of the amount due to Licensee.  Statements may be rendered "on account" for ongoing indemnifiable expenses such as attorneys' fees.  Licensee shall give Licensor prompt written notice of any claim that Licensee's use of the Trademark violates the rights of another.  Licensee shall give Licensor full control over the defense against such claim, including, but not limited to, the right to choose Licensee's attorneys, direct their conduct and Licensee's conduct, and to settle any such claims, provided Licensee receives a general release as a result of any such settlement.

5.2     Licensee shall not institute any action against a third party who Licensee claims is or will be infringing the Trademark in the Territory, unless and until Licensor, in writing, authorizes Licensee to institute the particular action, which authorization may be approved or denied in Licensor's sole and absolute discretion.  Nor shall Licensee settle or attempt to settle any claim against any alleged or actual infringer of the Trademark.  Licensor shall have total discretion as to whether or not to proceed against a third party who is infringing the Trademark.

5.3            Licensee shall defend Licensor, by counsel reasonably acceptable to Licensor, and indemnify and hold Licensor harmless from and against any and all actions, claims and proceedings, whether groundless or not, which may be instituted against Licensor by a third party (a) arising out of any act, omission or conduct of Licensee, their agents or employees, relating to the performance, implementation or exploitation of this Agreement, including without limitation, out of the manufacture, offer, sale, advertising or promotion of the Licensed Products by or for Licensee and/or (b) where such third party claim arises from the breach of this Agreement by Licensee.  For any matter indemnifiable hereunder, Licensee shall hold Licensor harmless from and against all claims, damages, expenses (including reasonable attorneys' fees and disbursements), costs, liabilities, settlements, fines or judgments relating to the above, and actually suffered by Licensor (but not for lost profits, consequential damages or punitive damages unless paid by Licensor to a third party as a result of a claim indemnifiable hereunder).  This indemnity does not extend to claims indemnifiable by Licensor pursuant to clause (a) of the first sentence of paragraph 5.1 above.  This indemnity shall be paid within thirty (30) days after the submission of a statement to Licensee of the amount due to Licensor.  Statements may be rendered "on account" for ongoing indemnifiable expenses such as attorneys' fees.  The amount of Licensee's product liability insurance specified in paragraph 5.4 below shall not, in any respect, limit the amount of Licensee's indemnity obligations pursuant to this paragraph 5.3 or paragraph 5.5 below.  Statements may be rendered "on account" for ongoing indemnifiable expenses such as attorneys' fees. Licensor shall give Licensee prompt written notice of any claim indemnifiable hereunder.  Licensor shall give Licensee full control over the defense against such claim, including, but not limited to, the right to choose Licensor's attorneys, reasonably acceptable to Licensor, direct their conduct and Licensor's conduct, and to settle any such claims, provided Licensor receives a general release as a result of any such settlement.

5.4            Licensee shall obtain and maintain during the Initial Term and for at least two (2) years thereafter, at Licensee's own cost and expense, product liability insurance with a reputable, financially secure, and is licensed to do

business in insurance company which maintains an office in the State of New York covering all Licensed Products marketed under the Trademark in the amount of $3,000,000.00, with Licensor named as an additional named insured under the said policy of insurance. The terms of such policy shall provide that it may not be canceled except on thirty (30) days prior written notice to Licensor. Licensee shall cause a certificate of insurance to be issued to Licensor within thirty (30) days after this Agreement is executed and shall instruct its insurer to notify Licensor of any actual, threatened or prospective cancellation, termination or modification of such policy. Licensee shall promptly reimburse Licensor for any premiums and other expenses that Licensor incurs in order to obtain or maintain such insurance because of Licensee's failure to do so. Such reimbursements shall not, however, cure or excuse Licensee's default in obtaining or maintaining such insurance.

5.5     Licensee shall indemnify and hold Licensor harmless from and against any and all claims, damages (including, without limitation, for loss of royalties and damage to the Trademark) costs and expenses (including reasonable attorneys' fees and expenses) incurred by Licensor as a result of the manufacture or sale by any of Licensee's contractors of (a) any counterfeit merchandise bearing the Trademark or (b) Licensed Products sold other than to Licensee, if Licensee places any orders with any contractor after Licensee has knowledge that the contractor has engaged in any activity specified in clause (a) or (b) above.

### ARTICLE VI

6.     <u>Default and Termination</u>

6.1     The following conditions and occurrences shall each constitute an "Event of Default", with time "being of the essence" as to all such matters:

(a)     Licensee's failure to pay Licensor the full amount due under any of the provisions of this Agreement by the prescribed date for such payment, including, without limitation, under paragraphs 2.1, 2.2 and 4.1, not cured within twenty (20) days after notice to Licensee;

(b) Licensee's failure to deliver full and accurate reports pursuant to any of the provisions of this Agreement by the prescribed due date therefor, not cured within twenty (20) days after notice to Licensee;

(c) Licensee's knowingly making or furnishing a false statement in connection with or as part of any report, notice or request rendered pursuant to this Agreement;

(d) Licensee's failure to maintain the insurance required under paragraph 5.4, not cured within five (5) days after notice to Licensee;

(e) Licensee's attempted or actual assignment, transfer or sublicense of Licensee's rights under this Agreement without Licensor's prior written consent;

(f) Licensee's use of the Trademark in unauthorized or unapproved form not cured within ten (10) days after notice;

(g) Licensee's use of trademarks other than the Trademark on or in association with Licensed Products without the prior written consent of Licensor;

(h) Licensee's breach of any obligations owed pursuant to paragraphs 5.3 or 5.5 above, not cured within twenty (20) days after notice;

(i) the sale of more than 100 units of Licensed Products in total, by one or more transactions, which (i) were not approved by Licensor pursuant to paragraph 3.2 or (ii) which, in any material respect, do not conform to the samples of such goods approved by Licensor;

(j) (i) the failure of Licensee to offer for sale the minimum number of styles required by paragraph 3.1 above or (ii) Licensee's breach of any obligation set forth in paragraphs 1.7, 1.9, 3.3, 3.4 or 3.5 above;

(k) the commencement by or against Licensee of any proceeding in bankruptcy, or similar law, seeking reorganization, liquidation, dissolution, arrangement,

readjustment, discharge of debt, or seeking the appointment of a receiver, trustee or custodian of all or any substantial part of Licensee's property, or Licensee making of an assignment for the benefit of creditors, or Licensee's acknowledgment of its insolvency or inability to pay debts, or the commencement of involuntary bankruptcy proceedings against Licensee which is not dismissed within sixty (60) days;

(1) (i) Joseph Chan owning less than fifty-one (51%) percent of the voting stock of Licensee, (ii) a shareholder of Licensee holding more than ten (10%) percent of the voting stock thereof being convicted of a felony or (iii) the sale of all or substantially all of Licensee's assets;

(m) the sale of more than 100 units, in total, in one or more transactions, of Licensed Products to any customer which is not within Authorized Distribution Channels;

(n) Licensee's use of the Trademark in connection with products not within the definition of "Licensed Products";

(o) if for sixty (60) days or more during the Initial Term there is not both a designer and two (2) Salespersons rendering service for Licensee in connection with this Agreement pursuant to paragraph 1.5(a) above;

(p) Licensee for a period of thirty (30) days fails to offer Licensed Products for sale;

(q) sale of Licensed Products outside the Territory;

(r) Licensee does not obtain and accurately report Net Sales equal to at least eighty (80%) percent of the Annual Minimum Net Sales for any Contract Year; or

(s) the breach by Licensee of any other material obligation owed Licensor not cured within thirty (30) days after notice to Licensee.

(t) Licensor shall have the right, but not the obligation, to terminate this agreement immediately upon written

DM:00309114.1

notice to Licensee at any time after the occurrence of an Event of Default. Upon any such termination all Minimum Guaranteed Royalties payable under paragraph 2.2 above due through September 30, 2007, if termination occurs during the Initial Term or due through September 30, 2010, if termination occurs during the Renewal Term, shall, as liquidated damages, but not as a penalty, accelerate and become immediately due Licensor from Licensee. Such termination and receipt of liquidated damages shall be without prejudice to any other right or remedy of Licensor, including the right to damages and/or equitable relief, to remedy any breach of this Agreement by Licensee prior to termination or any breach of any obligation that survives termination.

(u)      Licensee shall have the right, but not the obligation, to terminate this Agreement on written notice to Licensor if (i) Licensor grants a third party the right to use the Trademark in connection with the sale of Licensed Products effective during the Initial Term or (ii) Licensor materially breaches paragraph 5.1 of this Agreement and any such breach is not cured within twenty (20) days after notice of breach from Licensee. In the event of any such termination by Licensee, Licensee shall not be required to pay any Minimum Guaranteed Royalties coming due after the effective date of termination pursuant to this paragraph 6.2(b).

6.2      Sixty (60) days prior to the expiration of this Agreement or within ten (10) days after termination of this Agreement, Licensee shall provide Licensor with a written inventory of all fully-manufactured Licensed Products in Licensee's possession or in warehouses owned, leased or used by Licensee, and all work in progress. Such inventory shall specify for each location (with name and address of location specified) in which Licensed Products are maintained, the quantities by Style number of each item of Licensed Product possessed by Licensee, and the direct costs to Licensee of such Licensed Products. Licensor and/or its representatives shall upon at least ten (10) business days notice, be entitled to perform an audit of such Licensed Products of each such location. If such audit reveals an under-counting of the inventory by more than three (3%) percent, Licensee shall pay the full cost of the audit. Licensee shall be entitled to sell

Licensed Products following expiration of the Agreement or termination pursuant to paragraph 6.4 below, only to the extent such Licensed Products were included within the inventory timely provided Licensor under this paragraph 6.3 and were actually in possession of Licensee at such time, or were produced prior to expiration to fill an existing order and specified in a supplemental inventory provided within ten (10) days after expiration of this Agreement. The obligations set forth in this paragraph 6.3 shall survive the expiration and termination of this Agreement.

    6.3        Upon the effective date of termination of this Agreement, or expiration of this Agreement, Licensee, except as specified below, will immediately discontinue use of the Trademark, whether in connection with the sale, advertisement or manufacture of Licensed Products or otherwise, and will not resume the use thereof, or adopt any mark confusingly similar to the Trademark, including any trademark that would constitute a Related Mark, and will, at Licensor's option, (a) promptly destroy, or (b) sell and convey to Licensor (at a price equal to Licensee's landed duty-paid cost therefor) and free of all liens and encumbrances, all plates, engravings, silkscreens, computer tapes, molds, stitching patterns or the like used to make or reproduce the Trademark in Licensee's possession, and all items affixed with likenesses or reproductions of the Trademark in Licensee's possession, whether labels, bags, boxes, tags or otherwise, and, upon request by Licensor, will assign to Licensor, at no cost to Licensor, such rights as Licensee may have acquired in the Trademark. Any other provision in this Agreement to the contrary notwithstanding except as otherwise provided below, Licensee shall be entitled for a period of one hundred twenty (120) days after expiration of this Agreement, but not after a termination pursuant to paragraph 6.2(a) based on an Event of Default set forth in paragraphs 6.1(a), (c), (d), (e), (g), (h), (j) (involving as to (j), a breach of paragraph 3.3) or (q) (in which events no sell-off shall be permitted) to sell Licensed Products on a non-exclusive basis provided (a) the Licensed Products have been approved in accordance with Article III above, (b) Licensee makes no advertising or promotional use of the Trademark during such sell-off period, (c) Licensee pays Licensor timely the Percentage Royalties as specified below, (d) Licensee complies with all provisions of this Agreement during

the sell-off period, including, without limitation, paragraph 1.4(a) above and (e) Licensee has paid Licensor all monies due under this Agreement, including accelerated Minimum Guaranteed Royalties if due Licensor pursuant to paragraph 6.2(a), if sell-off is permitted after termination of this Agreement. Licensee shall pay to Licensor the Percentage Royalties due under paragraph 2.1 above for such sales of Licensed Products; such royalties however, shall be paid within fifteen (15) days after the end of each thirty (30) day period in the sell-off period for sales made during such one hundred twenty (120) day period, accompanied by the reports required under paragraph 2.1 above. Licensed Products are deemed sold when shipped. Notwithstanding anything contained above to the contrary, Licensor shall be entitled, but not obligated, to purchase from Licensee within thirty (30) days after receipt of the Inventory specified in paragraph 6.3 above, any or all of Licensee's Licensed Products which are not the subject of a pending order: (a) at a price equal to thirty (30%) percent off Licensee's then standard list price for such Licensed Products; or (b) in the case of a termination pursuant to paragraph 6.2 at a price equal to Licensee's landed duty-paid cost for such Licensed Products. In the event (a) Licensor does not purchase all of the aforesaid Licensed Products, (b) no sell-off rights are provided hereunder due to a termination of this Agreement or (c) all sell-off rights provided have expired, in any such event, Licensee shall be entitled, on twenty (20) days prior written notice to Licensor, at Licensee's option, to cause all Licensed Products in the possession of Licensee, to be destroyed on an agreed date, time and place, with Licensor and/or its representative entitled to be present at such destruction.

6.4    The terms and conditions set forth in paragraphs 2.1, 2.2, 2.3, 2.4, 2.5, 3.3, 3.4, 4.1, 4.2, 5.1, 5.2, 5.3, 5.4, 5.5, 6.1, 6.2, 6.3, 6.4 (and all paragraphs of this Agreement during sell-off), 7.1, 8.1, 8.2, 8.3, 9.1, 9.2, 9.3 and 10.1 (and paragraph 11.1, if this Agreement is renewed in accordance therewith) shall survive the expiration or termination of this Agreement so as to permit the enforcement of such provisions after the expiration or termination of this Agreement, without limiting the rights and remedies of the parties with respect to any breach of the Agreement pre-dating expiration or termination. Such survival shall not, however, impose on

Licensee any obligation not expressly set forth in this Agreement.

## ARTICLE VII

7. **Notices**

7.1     Any notices to be given under this Agreement, including, without limitation, notices to be given pursuant to paragraph 6.1 above, shall be in writing and shall for all purposes be deemed to be fully given by a party when sent by certified or registered mail, postage prepaid, return receipt requested, or reputable overnight carrier marked for next business day delivery, to the other party at the respective address set forth below. The date of mailing shall be deemed to be the date on which such notice is deemed to have been received three (3) business days after mailing if sent by mail and one (1) business day after deposit with an overnight courier marked for next business day delivery. Either party may change its address for the purposes of this Agreement by giving the other party written notice of its new address.

The address of Licensor is designated as:

Sa-al Universal LLC
247 West 37th Street
New York, New York  10018
Attention: Mr. David Shamouelian, Vice President

With a copy to:

Davidoff Malito & Hutcher LLP
605 Third Avenue
New York, New York  10158
Attention: Charles Klein, Esq.

The address of Licensee is designated as:

JMB Apparel Designer Group Inc.
214 West 39th Street
New York, New York 10018
Attention: Ben Choy, Vice President

DM:00309114.1

With a copy to

Kravet & Vogel, LLP
36 West 44th Street - Suite 900
New York, New York 10036
Attention: Joseph A. Vogel, Esq.

## ARTICLE VIII

8. **Enforcement of the Agreement**

8.1     This Agreement shall be governed by, and interpreted under, the laws of the State of New York without reference to principles of conflict of laws. Any controversy arising out of this Agreement, shall be resolved without a jury in a court located in the State of New York, County of New York. The parties consent to jurisdiction in such courts, waive any objection to such venue and waive trial by jury. Legal Process may be served on either party by Certified Mail, Return Receipt Requested or any other method permitted by the rules of the Court in which an action is commenced.

8.2     In the event any provision of this Agreement shall be held invalid or unenforceable, it shall be deemed modified, but only to the extent necessary to make it lawful. To effect such modification, the said provision shall be deemed deleted, added to and/or rewritten, whichever shall most fully preserve the intentions of the parties as originally expressed herein. Any such invalidity or unenforceability or modification shall not render the other terms invalid or unenforceable and the same shall be fully enforceable exclusive of the unenforceable provision except if modified by the Court and then only as so modified.

8.3     The obligations of the parties under this Agreement shall be binding upon their legal assigns and successors, but this Agreement may not be assigned by Licensee except with the prior written consent of Licensor, which consent may be granted or denied in Licensor's sole discretion. Licensor may assign its rights and obligations under this Agreement on written notice to Licensee to any entity that (a) assumes such obligations in writing and (b) (i) is the purchaser of all or substantially all of Licensor's assets or (ii) is

controlled directly or indirectly by a present shareholder of Licensor.

## ARTICLE IX

9. <u>Confidentiality</u>

9.1     During the Initial Term of this Agreement and any renewal thereof, both Licensor and Licensee acknowledge that they may be exposed to certain information concerning the other party's products and/or business which is confidential and proprietary information of such other party and not generally known to the public, including without limitation, the terms and conditions of this Agreement (but not the making thereof) the respective customers of the parties and design information furnished by either party ("Confidential Information"). Both Licensor and Licensee agree that at all times during and after the Initial Term of this Agreement, neither will use or disclose to any third party any Confidential Information of the other without the prior written consent of such other party. Notwithstanding the foregoing, this Article IX shall not apply (a) to any Confidential Information which becomes known to the public through no fault of the receiving party (Licensor or Licensee as the case may be) or which was already known by the receiving party and same can be demonstrated, or (b) to any Confidential Information required to be used or disclosed in connection with the enforcement of this Agreement or pursuant to a court or governmental order. Notwithstanding anything contained herein, (a) the parties may disclose Confidential Information on an as needed basis to their respective directors, officers, lenders, underwriters, investment bankers, attorneys and accountants and (b) Licensee may disclose Confidential Information to its sales agents, employees and contractors in order to design, manufacture and sell Licensed Products, provided all such persons and entities specified in (a) and (b) shall hold such Confidential Information in confidence. Any and all press releases, public announcements and publicity events regarding the entering into or performance of this Agreement shall be jointly approved by Licensor and Licensee.

9.2     Any violation by either Licensor or Licensee of its obligations pursuant to this Article IX shall not be adequately compensable by monetary damages and the non-violating party shall be entitled to an injunction or other appropriate

DM:00309114.1

decree specifically enforcing such party's obligations pursuant to this Article IX.

9.3     Upon termination of this Agreement, each party will return the other party's Confidential Information which is under its control or in its possession.

## ARTICLE X

10.  **Miscellaneous**

(a)     This document constitutes the entire agreement of the parties concerning the subject hereof. No representation, warranty, covenant, promise or agreement, even if previously or contemporaneously made, shall survive the signing of this document unless it be expressly stated herein. Except as provided in paragraph 8.2 above, this Agreement may not be altered, modified, terminated or discharged except by a writing signed by both parties. Neither party's failure, for any reason, to take action against a breach or default under this Agreement shall be construed as a waiver of the right to take action against any such breach or default, or similar breach or default, it being understood that no waiver shall be effective unless it be made in a writing signed by the party to be charged with it.

(b)     This Agreement does not make the parties joint venturers and neither party shall have the right to bind the other.

(c)     This Agreement may be signed in counterparts.

(d)     The prevailing party in any dispute, as determined by the trier of fact, shall be entitled to receive from the non-prevailing party an amount equal to the reasonable attorneys' fees, costs and expenses incurred by the prevailing party in connection with such dispute, and in any action or proceeding to collect such fees, costs and expenses. The trier of fact shall determine that a party is the prevailing party in any dispute if the dispute is resolved by the trier of fact predominantly in favor of such party.

(e)     The parties acknowledge that this Agreement is the result of negotiations between the parties and that no

ambiguity contained herein shall be construed against any party as the drafter of this Agreement.

## ARTICLE XI

11.     Renewal

11.1            Provided that Licensee is in compliance with all terms and conditions of this Agreement, including, without limitation, the terms and conditions set forth in paragraphs 2.1, 2.2 and 4.1, on both the date the Notice of Renewal (as such term is defined below) is sent, and the date the Renewal Term (as such term is defined below) commences, and (i) Licensee had at least Six Million ($6,000,000.00) Dollars of accurately reported Net Sales of Licensed Products during Contract Year 3, Licensee shall be entitled to renew this Agreement for one three (3) year renewal term commencing on October 1, 2007, and expiring on September 30, 2010, unless earlier terminated pursuant to this Agreement (the "Renewal Term"), by sending a notice of renewal to Licensor no earlier than January 1, 2005 or later than April 1, 2005 ("Notice of Renewal"). The terms and conditions applicable to the Renewal Term shall be the same as applicable to the Initial Term except that (a) the Minimum Guaranteed Royalties payable during the Renewal Term pursuant to paragraph 2.2 above shall be in the total amount of One Million Six Hundred Eighty Thousand ($1,680,000.00) Dollars, payable as follows:

| | |
|---|---|
| October 1, 2007 | $122,500.00 |
| January 1, 2008 | $122,500.00 |
| April 1, 2008 | $122,500.00 |
| July 1, 2008 | $122,500.00 |
| | |
| October 1, 2008 | $140,000.00 |
| January 1, 2009 | $140,000.00 |
| April 1, 2009 | $140,000.00 |
| July 1, 2009 | $140,000.00 |
| | |
| October 1, 2009 | $157,500.00 |
| January 1, 2010 | $157,500.00 |
| April 1, 2010 | $157,500.00 |
| July 1, 2010 | $157,500.00 |

(b) the Required Annual Advertising Payment payable by Licensee to Licensor, pursuant to paragraph 4.1 above, shall be the greater of (a) two (2%) percent of Licensee's Net Sales of Licensed Products or (b)(i) in Contract Year 4, the sum of One Hundred Forty Thousand ($140,000.00) Dollars, (ii) in Contract Year 5, the sum of One Hundred Sixty Thousand ($160,000.00) Dollars and (iii) in Contract Year 6, the sum of One Hundred Eighty Thousand ($180,000.00) Dollars, in amounts payable quarterly equal to the greater of (a) two (2%) percent of Licensee's Net Sales of Licensed Products for the preceding Quarter, or (b)(i) $35,000 per quarter in Contract Year 4, (ii) $40,000.00 per Quarter in Contract Year 5 and (iii) $45,000.00 per Quarter in Contract Year 6, (c) (i) Annual Minimum Net Sales for Contract Year 4 shall be Seven Million ($7,000,000.00) Dollars and (ii) Annual Minimum Net Sales for Contract Year 5 shall be Eight Million ($8,000,000.00) Dollars and (d) all references in this Agreement to the term "Initial Term" shall read "Renewal Term".

**IN WITNESS WHEREOF**, the parties have signed and entered into this Agreement as of the day and year first set forth above.

SA-AL UNIVERSAL LLC (Licensor)

By: _____
David Shamouelian,
Vice President

JMB APPAREL DESIGNER GROUP INC.
(Licensee)

By: _____

Ben Choy, Vice President

DM:00309114.1

## EXHIBIT A

Suggested Retail Prices

$250.00 - $400.00

## EXHIBIT C

Loehmann's
T.J. Maxx
Saks Off Fifth
Annie Sez
Nordstrom's Rack
Filene's Basement
Burlington Coat Factory