Joseph A. Vogel (JV-5533)
KRAVET & VOGEL, LLP
1040 Avenue of the Americas, Suite 1101
New York, New York 10018
Tel. 212-997-7634
Fax: 212-997-7686
E-mail: jvogel@kvnyc.com

*Attorneys for Defendant*
*JMB Apparel Designer Group, Inc.*

UNTIED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x  ECF CASE

SHARAGANO HOLDINGS, INC.,

                Plaintiff,         Civil Case No.: 07 Civ. 6244 (NRB)

v.

JMB APPAREL DESIGNER GROUP, INC.,

                Defendant.

------------------------------------------------------------------x

## AFFIDAVIT OF BEN CHOY

STATE OF NEW YORK      )
                                   ) ss.:
COUNTY OF NEW YORK   )

     **BEN CHOY**, being duly sworn, deposes and states as follows under penalties of perjury:

    1.    I am President of JMB Apparel Designer Group, Inc. ("JMB") the named defendant herein and submit this affidavit (i) in opposition to the application for injunctive relief filed by plaintiff Sharagano Holdings, Inc. ("SHI") herein, and (ii) at the direction of the Court to address the specific inquires made of JMB at the court appearance of counsel held on July 13, 2007, the date that SHI commenced this action.

**Preliminary Background**

2. JMB was formed in 2003 and is a designer and manufacturer of ladies suits, sportswear and casual clothing that it sells to department and other retail apparel stores throughout the United States and Canada. JMB's show room and main offices are located at 214 West 39th Street, Suite 400A, New York, New York. JMB's garments are manufactured overseas, primarily at a factory located in Shanghai, China, known as Shentong (China) Apparel Ltd. ("Shentong"), and imported into the US for direct delivery to its various retail customers. The principal owner of Shentong, Joseph Chan, is also the principal shareholder of JMB (in fact he is the "J" in JMB).

3. Today, JMB manufactures, sells and markets its garments exclusively under its proprietary "*Atelier*" brand and label.

4. In the past, during the period April 2004 through January 2006, JMB also sold ladies suits under the "Sharagano" trademark that it first licensed from SHI's predecessor (once removed), Sa-al Universal LLC ("Universal").

**The License Agreement**

5. Specifically, via Trademark License Agreement, dated April 1, 2004 (the "License Agreement"), Universal granted JMB the exclusive right to design, market and sell ladies suits in the US and Canada under the "Sharagano" trademark through September 30, 2007, unless terminated sooner. A true copy of the License Agreement is annexed as Exhibit B to SHI's complaint. At the time that JMB entered into the License Agreement, the Sharagano trademark was understood by JMB to be a vibrant and valuable trademark that was being actively promoted by Universal in its sale and manufacture of ladies sportswear under the

2

Sharagano trademark. The JMB License Agreement was the first effort to sell ladies suits under the Sharagano trademark.

6. In fact, during the period April 2004 through January 2006, JMB actively designed, promoted, sold, manufactured and marketed ladies suits under the Sharagano trademark and label. With Universal's permission, JMB sold its ladies suits under the License Agreement under the name "Sharagano *Atelier*" with the greater emphasis on the word Sharagano and a lower emphasis on the word *Atelier* (which is French for studio). During this period, JMB, as it was permitted to do under the License Agreement, also began to design, manufacture and sell ladies suits and sportswear under its own proprietary *Atelier* brand and label. Attached hereto as **Exhibit 1**, is a sample of the Sharagano *Atelier* label used by JMB for its ladies suits sold under the License Agreement and the similar Sharagano label used by Universal on the sportswear that it continued to sell under the trademark.

7. Soon after JMB entered into the License Agreement, JMB began to observe that Universal became less active in promoting the Sharagano trademark and its sales of Sharagano sportswear began to decline. As a result JMB began to receive less and less support from Universal in promotion and marketing of the trademark and less design assistance as well. JMB began to hear complaints from retailers to which it was attempting to sell Sharagano suits that Universal was late in deliveries of its Sharagano sportswear as well as quality complaints concerning Universal's garments. JMB then was advised that Universal was experiencing financial difficulties that were affecting its continuing sale of Sharagano sportswear, which in turn were adversely impacting JMB's abilities to sell Sharagano suits.

8. Eventually, JMB became aware that Universal effectively went out of business and that an entity known as PJDYH, LLC ("PJDYH") (SHI's immediate predecessor in interest)

3

had purchased all of Universal's rights to the Sharagano trademark as of November 2, 2004, subject to the License Agreement. On May 2, 2005, JMB entered into an amendment of the License Agreement with PJDYH to adjust for claims that JMB had raised with PJDYH concerning the licensor's lack of performance under the License Agreement, and JMB continued to market and sell Sharagano ladies suits under the License Agreement.

9.   After several months of operating under the License Agreement with PJDYH, despite promises of increased support and trademark promotion, JMB began to realize that PJDYH's performance as licensor under the License Agreement was no better than Universal's poor performance. Aside from JMB's efforts to promote and sell Sharagano suits, it appeared to JMB that no other Sharagano products were in the market place and as a result the Sharagano trademark was no longer as valuable as it had been in the past. Indeed, JMB's efforts at selling its Sharagano ladies suits under the License Agreement were continually being stymied by complaints and dissatisfaction that potential customers had experienced with other Sharagano products.

10.  As a result, JMB began to put more emphasis on its proprietary line of *Atelier* brand ladies suits and *Atelier* brand ladies sportswear, and less emphasis on the Sharagano brand of ladies suits.

11.  When JMB thereafter realized that the Sharagano trademark had become a "dead" label with virtually no market appeal and no likelihood of support from PJDYH, JMB ceased its efforts at marketing and selling Sharagano ladies suits completely and elected to terminate the License Agreement as of August 9, 2006, due to licensor's continuing material breaches and lack of support, by sending PJDYH a six-month termination notice, dated February 8, 2006, under the provisions of the License Agreement, whereby JMB voluntarily terminated all its rights and

obligations under the License Agreement effective as of August 9, 2006. A true copy of JMB's notice of election to terminate the License Agreement is annexed as Exhibit C to SHI's complaint.

12. The last sale of Sharagano ladies suits made by JMB was on January 16, 2006. Since that date, and beginning several months before, JMB has limited its sale of ladies suits and sportswear to garments, designed, manufactured and sold under its proprietary *Atelier* brand and label, and all marketing and advertising that JMB has been engaged in has been exclusively under the *Atelier* name.

13. It appears from SHI's papers that SHI purchased all of PJDYH's rights to the Sharagano trademark sometime in late August 2006, after JMB's termination of the License Agreement became effective.

14. Contrary to SHI's contentions, JMB is not today, nor has it since January 2006, sold or marketed any product under the Sharagano name or trademark.

### Addressing the Court's Specific Inquires

15. At the court appearance by counsel held on July 13, 2007, we understand that the Court inquired of the following:

(a) <u>When was the last time that JMB sold Sharagano ladies suits under the Sharagano label and hangtag under its License Agreement?</u> – JMB last sold Sharagano labeled suits on January 16, 2006, to a retail customer known as Fox's. A true copy of the JMB invoice for this shipment (shipped January 20, 2006) along with a copy of the customer's purchase order placing the order with JMB for such Sharagano suits on January 16, 2006 are annexed hereto as **Exhibit 2**. This was the last merchandise that JMB had in its possession and sold under the Sharagano trademark. All other garments that JMB sells and maintains in its warehouse are sold under the

*Atelier* name and label. Once this sale was completed, JMB had no more Sharagano labeled suits in its possession and JMB then sought shortly thereafter in February 2006 to terminate the License Agreement as detailed above.

(b) <u>When was the last time that JMB sold Sharagano ladies suits under the Sharagano label and hangtag under its License Agreement to (i) Lord & Taylor's stores and (ii) Filene's Basement stores?</u> – (i) JMB last sold Sharagano labeled suits to Lord & Taylor's stores was on September 30, 2005. Annexed hereto as **Exhibit 3** is a copy of the Lord & Taylor's inventory report for October 2005, confirming that 216 ladies suits were delivered by JMB under the Sharagano label as of the start of that month. (ii) JMB last delivered Sharagano labeled suits to Filene's Basement on September 15, 2005. Annexed hereto as **Exhibit 4** is a true copy of Filene's Basement's last purchase order (PO No. 411177), dated September 13, 2005, to JMB selling under the Sharagano label, for 100 Fall Line 2005 suits with last delivery date (indicated as "cancel date") being September 15, 2005. Thereafter, all purchase orders from Filene's Basement were to JMB under the *Atelier* label, see subsequent Filene's Basement purchase orders dated June 23, 2006 (PO No. 419424 for 1,050 suits to ship in August 2006) and April 26, 2007 (PO 434927 for 180 suits to ship in April 2007), both of which are annexed hereto collectively as **Exhibit 5**.

(c) <u>Show proof that JMB currently sells *Atelier* branded and labeled suits to (i) Nordstrom's and (ii) Lord & Taylor's.</u> – (i) JMB currently sells ladies sportswear (no suits) to Nordstrom's only under the *Atelier* brand and label. Attached hereto as **Exhibit 6** are copies of Nordstrom's purchase orders for April 2007 (for garments shipped April 5, 2007) and June 2007 (for garments shipped June 8, 2007), each of which list the supplier as "ATELIER." (ii) JMB currently sells ladies suits to Lord & Taylor only under the *Atelier* brand and label. Attached

6

hereto as **Exhibit 7** is a copy of Lord & Taylor's profitability recaps for June 2006 (for Spring Line 2006), September 2006 (for Fall Line 2006) and Third Quarter 2006 (Fall Line 2006 – shipped August –October 2006), each of which list "ATELIER" as the supplier; a copy of Lord & Taylor's weekly selling record faxed to JMB on July 2, 2007, showing sales by Lord & Taylor for week ending June 30, 2007, of JMB garments sold under the "ATELIER" name; as well as copies of Lord & Taylor invoice Nos. 002503, 002504, 002505 and 002506, each dated July 5, 2007, for garments currently shipped and sold to Lord & Taylor under the name JMB, for delivery of 56 garments under the *Atelier* brand and label. In addition, attached hereto as **Exhibit 8** are copies of Lord & Taylor advertising wherein JMB manufactured garments are being displayed and marketed under the *Atelier* brand and label for April 2006 (Spring Line) and September 2006 (Fall Line). Moreover, today, if one were to walk through the ladies better/bridge suit section (3rd Floor) of Lord & Taylor's New York City location, one would see that the brand *Atelier* is prominently highlighted by Lord & Taylor along with the names of other well known ladies suit manufacturers, such as *Tahari* and *Teri Jon* (see current photo of Lord & Taylor floor directory listing *Tahari*, *Atelier* and *Teri Jon* annexed as part of Exhibit 8).

(d)  <u>Explain internet advertising that appears as Exhibits E & F of Plaintiff's Complaint.</u> – JMB does not advertise or market its garments via the internet. In fact the only retailer to which JMB sells that uses the internet to JMB's knowledge is Loehmann's stores, which does in fact sell JMB's *Atelier* suits on its internet store. Attached hereto as **Exhibit 9** are Loehmann's purchase orders Nos. 73573 and 73574, dated December 13, 2006, to JMB for the purchase and delivery in March 2007 of 420 garments, each designated by Loehmann's to contain the "LABEL: "ATELIER." With respect to the specific Google hits listed as part of plaintiff's Exhibit E, none represents a customer to which JMB sold Sharagano labeled suits and,

7

if anything, such sites obtained their garments from others, such as liquidators and/or overstock resellers, outside the control of JMB. Indeed, in most cases when the site is clicked on nothing comes up indicating that the website listing is no longer active; in the few instances that do result in an active website, either the JMB suit cannot be found or they depict garments that were sold by JMB as part of its Fall 2005 Line (sold for delivery during the period July through December 2005), when JMB had the right to sell Sharagano labeled suits under its License Agreement. Likewise, with respect to the photos of garments listed on plaintiff's Exhibit F, attached hereto as **Exhibit 10** is a reprint of the exhibit with hand marked indications showing the product lines depicted, as best as we can determine from the photo as no style numbers are indicated. In each case, with two exceptions, the garments indicated appear to be similar to garments that JMB sold as part of its Fall 2004 Line (sold for delivery during July through December 2004), its Spring 2005 Line (sold for delivery during January to April 2005) or its Fall 2005 Line (sold for delivery during the period July through December 2005), when JMB had the right to sell Sharagano labeled suits under its License Agreement. The two exceptions are one garment that JMB does not recognize at all, described as an "Atelier Taupe 3-Button Shadow Striped Pantsuit" (JMB never made such a garment, perhaps the description is erroneous) and one garment described as an "Atelier Black Two Button Skirt Suit" this item was last sold in January 2006 under the License Agreement before it was terminated.

(e)    Provide actual copies of JMB's current *Atelier* hangtags and labels. – Annexed hereto as **Exhibit 11** is a grouping of JMB's historical and current *Atelier* hangtags and labels. JMB has been experimenting with a multitude of varied styles and colors for its tags to determine which tag and style it prefers. The hangtag identified as "A" was used by JMB throughout 2006 and for approximately 40% of its Spring Line 2007. The hangtags identified as "B" and "C"

8

were used for the Spring Line 2007 only and shipped during the period January to April 2007; approximately 15% of garments shipped during this period used tag "B" (without website address) and approximately 10% used tag "C" (with website address). The hangtags identified as "D" and "E" were also used conjointly for JMB's Spring Line 2007, with tag "D" used on approximately 20% of the garments shipped during this period (January to April 2007) and tag "E" used on approximately 15% of the garments shipped during this period. JMB was experimenting with multiple tags for its Spring 2007 Line; thus tags A (40%), B (15%), C (10%), D (20%) and E (15%) were all used during this period in the indicated approximate amounts. The hangtag identified as tag "F" was used for JMB's Fall 1/Transition Line 2007 (shipped May to July 2007) and will also be used in part for JMB's Fall 2/Winter Line 2007 (shipping July to December 2007). The hangtag identified as "G" is our most current tag; it is double sided and also will be used for our Fall 2/Winter Line 2007. This tag also will ship during the period July 2007 to December 2007. The hangtag identified as "H" is JMB's premium denim tag for use in its *Atelier* denim sportswear line. The corresponding interior garment labels match the particular hangtag used during each period.

(f) <u>Explain hangtag that appears as plaintiff's Exhibit D</u>.  The hangtag that appears as Exhibit D to plaintiff's complaint is identical to the hangtag identified as hangtag "B" in **Exhibit 11** hereto. This was one of the earliest JMB *Atelier* hangtags used and was affixed to approximately 15% of the garments shipped by JMB during the January to April 2007 period as part of JMB's *Atelier* Spring Line 2007. The illegible script design that appears in the upper left corner of this tag is no longer used by JMB, but at the time was a design that JMB was experimenting with. The illegible script was intended to be illegible and was a design requested by JMB's majority shareholder Joseph Chan who also owns and operates the factory in

9

Shanghai, China that manufactures JMB's garments. The "Sh" portion of the otherwise illegible script design was designed in Shanghai and intended to be a design attributable to the Shanghai factory that Mr. Chan owns, that is known as Shentong. The script was intentionally designed to be illegible because Shentong's Shanghai factory also manufactures private label goods for many large retail department stores and some other large manufacturers (such as the *Tahari* brand), and if this design became permanent the Shanghai factory did not want to raise any objections from these private label customers. The design, however, was short-lived as once put into brief production, we did not like its look and we felt that the illegible design took away from the *Atelier* label and the *Atelier* website that JMB sought to promote and develop. As a result we prevailed on Mr. Chan to abandon the experiment and the illegible design was quickly dropped after this limited production, never to appear again in any subsequent JMB labels as evidenced in **Exhibit 11**. The illegible script was <u>not</u> intended to say or suggest the word "Sharagano" as contended by plaintiff in this action. Nor, I submit could anyone with any certainty ever read this design (beyond maybe the first two letters) as spelling the word "Sharagano" from this otherwise illegible script, without resorting to significant speculation and surmise. Certainly, it is nothing like the Sharagano logo that was used in the marketplace in the past by JMB and Universal (see **Exhibit 1**).

### No Facts Support Plaintiff's Claims

16.     Based on all of the above, it is submitted that plaintiff's claims of trademark infringement by JMB are without any factual basis. We understand that the Sharagano trademark is a dead label and a dead mark today with little or no value in the market place and certainly is of no appeal to JMB. That is precisely the reason that JMB sought to terminate the License Agreement in February 2006, effective as of August 9, 2006, as JMB no longer wanted

to be associated with a trademark that we viewed as dead and worthless. Perhaps SHI, as the latest owner of the Sharagano trademark, is now trying to revive this trademark, but to our knowledge it is not presently on any garments in any stores that we know of.

17. Nor are we aware of any retailer or consumer who actually confuses the garments that we currently sell under the *Atelier* band and label with the dead Sharagano trademark – a mark to our knowledge that is not in current or active use.

18. The affidavit submitted by plaintiff's principal, David Lomita, that claims that JMB is selling Sharagano trademarked goods to Filene's Basement and Lord & Taylor as of June 2007 (Lomita Affid., ¶ 11), is demonstrably false, as evidenced by the documents annexed hereto as **Exhibits 3, 4, 5, 8 and 11**. Likewise, David Lomita's claim that in June 2007 Nordstrom "believed that it was carrying SHARAGANO apparel" sold by JMB (Lomita Affid., ¶ 12), is rebutted by the documents annexed hereto as **Exhibit 6**. Similarly, David Lomita's assertions that JMB is currently selling Sharagano trademarked goods on the internet (Lomita Affid., ¶¶ 13 and 14), are shown above to be untrue. Equally false, are David Lomita's several self serving and factually unsupportable proclamations that the Sharagano trademark is "distinctive and has become a symbol of quality throughout the Untied States" (Lomita Affid., ¶ 19), "has achieved substantial market success" (Lomita Affid., ¶ 25), "has continuously been used in commerce since 2003 …[and] has become well known for high quality throughout the Untied States" (Lomita Affid., ¶ 26), when in truth and in fact the opposite is the case. To my knowledge, the Sharagano trademark is nowhere to be found in any major retail stores today and, other than perhaps as found on e-Bay or some other overstock and liquidator internet sites, is currently not an available or active trademark known to the consuming public.

19. Accordingly, when JMB received SHI's cease and desist letter (copy annexed as Exhibit G to plaintiff's complaint), I directed JMB's attorneys to respond via letter, copy of which is annexed as Exhibit H to plaintiff's complaint, advising SHI that JMB has not sold any Sharagano labeled garments since before February 2006, and thus no factual basis existed for SHI's claims. Rather than making further inquiry of JMB, plaintiff chose to commence suit, we submit without a good faith basis to do so.

20. In light of the above, the order to show cause should not be signed as presented, and JMB respectfully urges this Court to decline SHI's request for injunctive relief. Indeed, because of the utter lack of any demonstrated proof supporting plaintiff's claims, JMB also respectfully urges this Court to consider awarding JMB its costs and fees in responding to these baseless accusations.

_____
BEN CHOY

Sworn to before me this
13th day of July, 2007

_____
Notary Public

JOSEPH A. VOGEL
Notary Public, State of New York
No. 02VO4756050
Qualified in Nassau County
Commission Expires June 30, 20 11

12